BBAND, C. J.
 

 On 6 December 1952 there was filed with the clerk of this court a complaint and information in the nature of quo warranto. The proceeding was brought in the
 
 *4
 
 name of the State of Oregon on the relation of Edward O. Stadter, Jr., District Attorney of Marion County. The plaintiff asks this court to take original jurisdiction of the cause and thereafter to issue an order directing the defendant Paul L. Patterson to appear and show cause why judgment should not be rendered against him that he is guilty of usurping, intruding into and unlawfully holding and exercising the office and functions of the governor of the State of Oregon. Plaintiff prays that judgment be rendered against the defendant declaring that he is guilty of such usurpation and that he be ousted from the office. Thereafter and on the same day the matter was presented in open court. The defendant appeared by his counsel and joined in the request that we take original jurisdiction. The Honorable Earl Newbry, Secretary of State, was represented by counsel who asked permission to file a brief as amicus curiae in support of the defendant Patterson. After hearing counsel for the parties the court took the application under advisement and thereafter made an order approving the filing of the complaint and assuming original jurisdiction of the cause. The requested show cause order was made and the Secretary of State was authorized to file a brief. With consent of all parties the case was set for hearing upon the merits on 9 December at 10 o’clock a.m. The defendant appeared and filed an answer on 6 December. Thereafter and on the same day the plaintiff filed a motion for judgment on the pleadings “for the reason * * * that there are no issues of fact, and the only matter for consideration is the correctness of the legal conclusions drawn by the respective parties *
 
 *
 
 The cause is now submitted for decision upon the arguments and briefs of the parties and the
 
 *5
 
 brief of amicus curiae. The facts being admitted, we will recite them in narrative form:
 

 “On or about the 7th day of November 1950, Douglas McKay was elected by the people of the State of Oregon Governor of the State for a four year term; he qualified and took office as governor on or about the 9th day of January, 1951; his term of office commenced on said date and would end on or about the 10th day of January 1955.
 

 “The defendant, Paul L. Patterson, was duly elected, qualified and became a member of the senate of the legislative assembly of the state for the 11th Senatorial District, for Washington County, on the 9th day of November, 1948, and his said term of office expired on the 4th day of November, 1952, except as it may have been continued by the adoption of the amendment to Section 4, Article IV, adopted by the people in the general election held November 4, 1952 and proclaimed by the Governor on December 1,1952. On the 4th day of November, 1952, he was elected for a four year term as such senator to succeed himself.”
 

 On the convening of the 46th legislative assembly of Oregon the defendant was elected to and qualified as president of the senate of said assembly. Said assembly adjourned sine die 3 May 1951.
 

 ‘ ‘ On the 6th day of December, 1952, said Douglas McKay left and absented himself from the State of Oregon, and at all times since has been and now is absent from and is without the boundaries of said state.”
 

 On December 6, 1952 and ever since said date the defendant:
 

 “ * * * has claimed and asserted that, due to the absence from the state of Douglas McKay, its duly elected, qualified and acting governor, he, the defendant, as president of the senate of the legislative assembly of Oregon, and under and by virtue
 
 *6
 
 of the provisions of Section 8, Article V of the Constitution of said state, has been and is the duly constituted successor of the said Douglas McKay to the governorship of the state of Oregon and has been and is acting in such capacity as governor, and that he will continue to be governor and will so exercise the functions of that office and be in possession of books, files, documents and other property pertaining to said office until the return of the said Douglas McKay to the state of Oregon.”
 

 The legal contentions of the parties are set forth in the pleadings. The plaintiff alleges that the 46th legislative assembly became “functus officio” on 3 May 1951 and that by reason of the adjournment of said legislative assembly on said day the office of the President of the Senate became vacant and “there is no 46th legislative assembly and there is no president of it.” Plaintiff alleges that:
 

 “The term of office of the said Paul L. Patterson as a member of the senate of the legislative assembly of the State of Oregon expired on November 4, 1952, and since said date he has not been a member of the 46th legislative assembly of the state, and is not and cannot be or continue in office as president of the senate of said 46th legislative assembly.”
 

 Plaintiff contends as a second ditch argument that if the adjournment of 3 May 1951 did not end the existence of that body and thereby terminate incumbency of the defendant as president of the senate, then the 46th assembly came to an end on 4 November 1952, the date of the general election of senators and representatives, with a similar result. Plaintiff contends that if there is a presently existing legislative assembly it is the 47th and not the 46th and that the defendant has never been elected president of the senate of said assembly.
 

 
 *7
 
 A fourth contention of plaintiff is that since 4 November 1952 there has been no president of the senate. The defendant, while admitting that he has never been elected president of the 47th legislative assembly, contends that the 46th assembly does now exist and is the legislative assembly of the State of Oregon, that the 47th assembly will not come into existence until the first Monday of January 1953 and that he will continue to be the president of the senate until said last-named date. In the alternative he contends that he is and will continue to be the president of the senate until the second Monday of January 1953, and as a third alternative he contends that he is and will be president of the senate until his successor shall have been elected and qualified or that he will so continue as president until 5 January 1953.
 

 At the general election in November 1948 the defendant Patterson was elected to the senate for a four year term and on 4 November 1952 he was reelected to the same office. On or about the eighth day of January 1951 he was elected president of the senate. The Constitution of Oregon provides:
 

 “In case of the removal from office of the governor, or of his death, resignation, absence from the state or other inability to discharge the duties of the office, the president of the senate,
 
 or if there be none, or in case of his removal from office, death, resignation, absence from the state, or other disability, then the speaker of the house of representatives, or if there be none, or in case of his removal from office, death, resignation, absence from the state, or other disability, then the secretary of state, or if there be none, or in case of his removal from office, death, resignation, absence from the state, or other disability, then the state treasurer,
 
 shall become governor until the disability be removed, or
 
 *8
 
 a governor be elected at tbe next general biennial election. The governor elected to fill the vacancy shall hold office for the unexpired term of the outgoing governor.” Const, Art V, sec 8, as amended in November, 1946. See Oregon Laws 1947, p [5].
 

 If the defendant Patterson was president of the senate when on 6 December 1952 Governor McKay left the state, then by the same token, the defendant at that moment became governor during the absence of Governor McKay.
 

 The plaintiff asserts in substance that there can be no president of the senate unless there is a senate, that the senate comprises, with the house, the legislative assembly, and that the legislative assembly ceased to exist when it adjourned sine die. Therefore it is said there ceased to be a president of the senate after the adjournment on 8 May 1951.
 
 State ex rel Sullivan v. Dammann,
 
 221 Wis 551, 267 NW 433 is cited in support. The Wisconsin Constitution provided :
 

 “* * * If any bill shall not be returned by the governor within six days (Sundays excepted) after it shall have been presented to him, the same shall be a law unless the legislature shall, by their adjournment, prevent its return, in which case it shall not be a law.”
 

 The only question decided in the Dammann case was whether the word “adjournment” meant sine die adjournment or a temporary adjournment occurring during a session. The court very properly held that adjournment sine die was meant. Having decided the question the court said, “When a Legislature adjourns sine die, it ceases to exist, and consequently has no right to reconsider a bill disapproved by the Governor * * The statement that the legislature
 
 *9
 
 “ceases to exist” was unnecessary to the decision. It would have been sufficient to hold that the legislative session ceased to exist, with the obvious result noted by the court, i.e., that the legislature thereafter had no right to reconsider a bill disapproved by the governor. The distinctions between the end of the session, the end of a (legislative) term, and the end of a legislature or legislative assembly, are of the essence.
 
 Byrd v. Byrd,
 
 198 Miss 249, 8 So2d 510, cited by plaintiff adds nothing requiring our attention.
 

 Section 12 of Article V of the constitution provides that the governor “may
 
 * * *
 
 convene the legislative assembly * * *” in special session. The phraseology employed implies that there will be in existence a legislative assembly which can be convened notwithstanding the fact that the regular session may have previously adjourned sine die. The general and special sessions in a biennium have uniformly been designated as sessions of the same legislative assembly. See Session Laws and Journals. Thus, in 1933 there was held a special session which met on 3 January of that year and ended on 7 January of the same year. The regular session convened on 9 January of the same year. Both were officially designated as being sessions of the 37th legislative assembly. In 1935 the regular session of the 38th legislative assembly convened on 14 January of that year and adjourned sine die on 13" March of the same year. Pursuant to the call of the governor a special session convened on 21 October 1935. It was officially designated as the special session of the 38th legislative assembly. Whatever may be the rule elsewhere, the legal existence of the legislative assembly- of Oregon continues after the adjournment of a regular biennial session. It cannot function as such upon its own initiative after
 
 *10
 
 that date, but this is true merely because no member of the legislature has power to reconvene it. When, pursuant to constitutional authority, the governor convenes it, there begins a new session of an old legislative assembly. The argument that the defendant could not have been president of the senate because the legislative assembly had ceased to exist on final adjournment is invalid at least as to the period between adjournment and 4 November 1952. If the legislative assembly continues as such after adjournment sine die, so do the senators and representatives who comprise the assembly continue as senators and representatives. The statutes recognize this fact. Chapter 90 of the Laws of 1947 provides in part:
 

 “When any vacancy occurs in the office of senator * * * due to * # * resignation * # # such vacancy shall be filled by the appointment #
 
 * *.
 
 If, however, such vacancy does not occur during a legislative session and if an election is to intervene between the occurrence of any such vacancy and the time of convening of any regular or special session of the legislature at which such vacancy can be filled by vote of the electors
 
 *
 
 *
 
 *
 
 no interim appointment shall be made * *
 

 Here is a clear recognition that a senator or representative continues as a public officer after adjournment sine die. Before a vacancy can
 
 occur
 
 when the legislature is not in session, someone must have occupied the office up to the time of the occurrence. We may add that if senators did not continue in office after adjournment, no call by the governor to a special session could infuse them with official life.
 

 The defendant was a senator, but he was more than a senator. The constitution and the statutes imposed duties upon him as
 
 president of the senate,
 
 duties which could not be performed during the session
 
 *11
 
 and which if they were to be performed at all had to be done after adjournment. At least as long as the defendant is president of the 46th legislative assembly he is a constitutional officer of the state. The constitution provides that each house when assembled shall choose its own officers. Const, Art IV, § 11. The presiding officers of the assembly “shall, in virtue of their office, receive an additional compensation * * Const, Art IV, § 29. The president of the senate is designated as the person who shall succeed to the office of governor in the event of the resignation of the governor. Const, Art V, § 8, see supra. It can scarcely be argued that the constitution has made provision that the president of the senate shall succeed to the governorship if the governor dies or resigns during the legislative session but not if he dies or resigns after its adjournment. Yet this would be the result if plaintiff is correct in claiming that there is no president of the senate after the legislative assembly adjourns. If there is no president of the senate after adjournment, then there is also no speaker of the house. On plaintiff’s theory if the governor resigned the day before adjournment, the president of the senate would become governor but if he resigned the day after adjournment, the third official in order of constitutional preference, the secretary of state, would become governor. We think the intent expressed in the constitution is that at least so long as there is a legislative assembly which could be called into special session, the president of the senate, once duly elected, remains president, assuming that he has not been removed from office by the selection of another, has not resigned, is not under other disability, and is not dead. Under these conditions, if during the life of the 46th legislative assembly, the governor should leave the state,
 
 *12
 
 or for some reason should resign, the defendant then being within the state would succeed to the governorship.
 

 Our conclusion that the defendant continued to be president of the senate after the adjournment is fortified by statutory provisions. In 1937 the president of the senate was made an ex officio nonvoting member of the standing committee of the senate on interstate cooperation, with duties extending beyond the adjournment of the legislative session. OCLA, § 91-601. In 1951 the president of the senate became an ex officio voting member. Oregon Laws 1951, ch 294. In 1951 he was empowered to appoint members of certain interim committees. Laws 1951, pp 1172-3; HJK. 17 and HJK. 18. In 1951 the legislature created a new emergency board composed of the president of the senate, the speaker of the house and others, the terms of the members to coincide with the interim period between the adjournment of a regular session and the convening of the next regular session. Laws 1951, ch 437.
 

 It is next argued that the 46th general assembly expired on 4 November 1952 if it had not died previously. In answer to this contention the defendant relies upon the provisions of Article IV, section IV of the constitution as amended at the November 1952 election. That section, after providing for the commencement and terms of senators and representatives, continues:
 

 “* * *
 
 Any Senator or Representative whose term, under the former provisions of this section, would have expired on the day following the regular general election in 1952, shall continue in office until the first Monday in January, 1953.”
 

 
 *13
 
 Sound reasoning and the history of the pertinent constitutional provisions both require us to hold that the quoted portion of the amendment operated to extend the terms of the senators and representatives who were members of the 46th legislative assembly and whose terms
 
 would have expired
 
 on or about the day following the general election of 1952, so that their terms would not expire until the first Monday in January, 1953. They were members of the 46th legislative assembly and the amendment extended the life of that assembly along with the lives of its members. The extension of a term of office is not an election of new officers.
 

 The purpose underlying the 1952 amendment was to make it clear that the 46th and subsequent legislative assemblies should remain subject to call by the governor in the event of an emergency arising after the November election of senators and representatives and before the newly elected officials were empowered to meet and organize.
 

 The constitution provides that the legislative authority of the state shall be vested in a legislative assembly consisting of a senate and house of representatives. Const, Art IV, § 1. It is further provided that each house shall have all powers necessary for a branch of the legislative department of a free and independent state. Const, Art IV, § 17. Unless forced to it, we can accept no construction of constitutional provisions which would leave a hiatus from 5 November 1952 until the first Monday in January 1953, during which time the sovereign legislative power of the state would be suspended. An analysis of constitutional and statutory provisions supports our conclusion.
 

 
 *14
 
 Until its amendment in November, 1952, section 4 of Article IV provided that “The senators shall be elected for the term of four years, and representatives for the term of two years from the day next after their general election; * * This would imply that their terms expired in
 
 November,
 
 either four or two years later as the case might be. In 1882, pursuant to provisions of constitution Article IV, section 10, a statute was enacted in part as follows: “The session of the legislative assembly shall be held biennially * * * and the time of meeting be changed # * * to the second Monday in January * * *.” OCLA, § 94-105. The statute is still in force.
 

 Before 1908 the constitution provided that general elections should be held biennially in June. In 1908 section 14 of Article II was amended to read as follows:
 

 “The regular general biennial election in Oregon for the year A. D. 1910 and thereafter shall be held on the first Tuesday after the first Monday in November. All officers except the governor, elected for a six-year term in 1904, or for a four-year term in 1906, or for a two-year term in 1908, shall continue to hold their respective offices until the first Monday in January, 1911;. and all officers except the governor, elected at any regular general biennial election after the adoption of this amendment, shall assume the duties of their respective offices on the first Monday in January following such election. All laws pertaining to the nomination of candidates, registration of voters, and all other things incident to the holding of the regular biennial election shall be enforced and be effected the same number of days before the first Tuesday after the first Monday in November that they have heretofore been before the first Monday in June biennially, except as may hereafter be provided by law.” Const, Art II, § 14 (9 OCLA, p 153.)
 

 
 *15
 
 Section 14, supra, is part of the Article dealing with “Suffrage and Elections”, and is no part of the Article IV, Legislative Department, nor Article V, Executive Department. The words “All officers except the governor” include members of the legislature who are repeatedly referred to as “officers” in the constitution.
 

 In 1920 constitutional provision was made for the succession to the office of governor in event of his death, resignation, absence, etc. The preferred order of succession was first, the president of the senate, and second, the speaker of the house. Const, Art V, §8(9 OCLA, p 211.) In 1946 Article V, section 8 was amended to read as set forth earlier in this opinion. It should be noted that Article V deals with the executive and not with the legislative department. The provisions of section 8 in effect provide for a constitutional officer having the attributes of a lieutenant governor. If we can identify the person who at the moment of resignation or absence of the governor is “the president of the senate” then such person ipso facto becomes governor.
 

 Prior to 1913 the term of the governor commenced on the second Monday of September. LOL, § 2608. After the enactment of chapter 84, Laws of 1913 (OCLA, § 90-101) his term commenced upon the publication of the returns by the speaker of the house of representatives as provided by section 4 of Article V of the constitution. He was elected at “the times * * * of choosing members of the legislative assembly * * *” Const, Art V, § 4.
 

 Prior to November 1952 it would appear that there was some doubt as to the proper construction of the constitutional provisions. The terms of senators and representatives apparently expired in November after
 
 *16
 
 the general elections (old Article IV, §4) when new legislators were chosen. The new legislators elected after June 1908 assumed their duties on the first Monday in January (Const, Art II, §14) and their time of meeting was the second Monday of January following their election. OCLA, § 94-105. The original section 4 of Article IV and the 1908 amendment to Article II, section 14 appeared to be inharmonious, and to create a hiatus in the legislative power of the state, the one providing that legislative terms ended four or two years after November elections, and the other providing that elected legislators assume their duties on the first Monday in January and then hold for four or two years thereafter. The 1908 amendment having been adopted after the adoption of original Article IV, section 4 might well have been considered controlling, in order to avoid the hiatus which would occur in subsequent years. The 1908 amendment to Article II, section 14 extended the terms of all officers (except the governor) elected for a four-year term in 1906 or for a two-year term in 1908, to the first Monday in January, 1911, avoiding the hiatus in 1910 and 1911. So far as we know, no question has been raised as to the validity of that extension of legislative terms by constitutional authority. The same procedure followed in 1952 should be equally immune to criticism. The apparent inconsistency between old Article IV, section 4, and Article II, section 14 as amended, was a compelling reason for the amendment of Article IV, section 4, in 1952.
 

 The 1952 amendment, in harmony with the provisions of Article II, section 14, provides that the terms of legislators shall commence on the first Monday in January following election, and then, to avoid
 
 *17
 
 a hiatus in 1952, it extends the terms of senators and representatives, which terms, under the provisions of old Article IV, section 4, if still in force, would have expired on or about the day following the 1952 election. It must be borne in mind that it is a constitutional provision with which we are dealing. It cannot be held unconstitutional unless in conflict with the federal supreme law. The amendment was adopted by the voters on 4 November 1952. The plaintiff relies upon the provisions of constitution, Article XVII, section 1, the pertinent portions of which provide:
 

 “ * *
 
 * If a majority of the electors voting on any such amendment shall vote in favor
 
 thereof,
 
 it shall thereby become a part of this constitution.
 
 The votes for and against such amendment or amendments, severally, whether proposed by the legislative assembly or by initiative petition, shall be canvassed by the secretary of state in the presence of the governor, and if it shall appear to the governor that the majority of the votes cast at said election on said amendment or amendments, severally, are cast in favor thereof, it shall be his duty forthwith after such canvass, by his proclamation, to declare the said amendment or amendments, severally, having received said majority of votes to have been adopted by the people of Oregon as part of the constitution thereof, and
 
 the same shall be in effect as a part of the constitution from the date of such proclamation. *
 
 * * ”
 

 Notwithstanding the ambiguous character of this provision, we will assume that the amendment did not become a part of the constitution until 1 December when the Governor proclaimed its adoption. But the amendment is clearly retroactive and on its face it purports to extend the terms of any senator or representative whose terms
 
 would have expired
 
 on the day following the regular general election in 1952. The
 
 *18
 
 amendment does not elect anyone. It affects the terms of previously elected officials and it does it by the supreme mandate of the people of Oregon themselves. Though retroactive, it needs no citation of authorities to show that it is not ex post facto. The provisions relative to ex post facto laws apply only to criminal statutes.
 

 It was suggested by counsel for plaintiff that there were no terms of office which would have expired on the day following the regular general election in 1952. The argument runs thus: The 1948 election was held on 2 November, and constitution Article IY, section 4, at that time provided that senators shall hold office for four years
 
 from the day next after
 
 the general election, which it is said would be four years from 3 November. If a calendar year be implied, the terms would end on 3 November instead of on 5 November, which is the “day following the regular general election” in 1952. We think the point is highly technical. It has been commonly considered that the four years were four election years from the day following the 1948 election to the day following the 1952 election, and the intent of the amendment is clear. We should not upset the expressed will of the people on so flimsy a pretext. The word year, as used in statutes or constitutions, ordinarily means calendar year, but the meaning in all cases is dependent on the subject-matter and the connection in which the word is used. “It may mean a political year, or the period between two elections * * *.” 62 CJ, Time, §13, p 966;
 
 Hops v. Poe,
 
 25 Cal App 451, 143 P 1072;
 
 Battle Creek Brewing Co. v. Board of Supervisors,
 
 166 Mich 52, 131 NW 160.
 

 We hold that the 46th legislative assembly continued to exist at least until the term of the newly
 
 *19
 
 elected legislators begins on the first Monday of January. The defendant is the president of the senate of that assembly. Governor McKay being out of the state on 6 December 1952, the defendant became, by virtue of his constitutional office as president of the senate, governor of the State of Oregon. In the event of the continued absence of Governor McKay, the defendant will continue to be governor, at least until the first Monday in January if the absence continue so long.
 

 The legislative practice gives some support to our conclusion. The regular 38th legislative assembly convened on 14 January and ended on 13 March of 1935. A special session convened on 21 October 1935 pursuant to call of the governor. On the first day of the session the senate adopted Senate Resolution No. 1 which reads in part as follows:
 

 “That the organization of the senate at the last regular session of the legislature of this state, convened in January, 1935, be and the same hereby is continued and recognized and made to be the organization of this senate at and during the present * * * session of the legislative assembly and [with certain exceptions not material here] each and every officer of this senate, holding office at the expiration of said regular session,
 
 shall
 
 continue in office as if regularly elected * * V’ (Italics ours.)
 

 Thereupon the president of the senate proceeded to function as such.
 

 While it may be said that the senate could have removed the president of the senate at the opening of the special session by affirmative action, and could have elected another in his place, the wording of the resolution shows that no new election was deemed
 
 *20
 
 necessary or was held. The president was continued in office, which implies that he was such president when the special session met. The only act deemed by the senate to be appropriate was to declare that his presidency was “recognized.”
 

 It is argued with some force that the president of the senate holds office until his successor is elected and qualifies. We agree with the argument of defendant to the effect that the president of the senate has been made a constitutional officer having powers and corresponding duties to be performed during the interim which follows adjournment. So long as he is president of the senate he has those powers and duties. We have held that the 46th legislative assembly continues to exist and is subject to call until the commencement of the terms of the newly elected senators and representatives which occurs on the first Monday in January. It is difficult to see how the 46th legislative assembly could exist after that event. But so long as the 46th legislative assembly exists its elected president exists, assuming that he is not sooner ousted from office, resigns or becomes disqualified. But it appears likely that the constitutional powers and rights vested in him are vested in him as president of the senate. The startling suggestion is made that it is unnecessary to be a senator in order to be president of the senate. Only upon such an assumption could we hold that the president of the senate continues to be president after he has ceased to be a senator. Section 1 of Article XV provides that “all officers
 
 except members of the legislative assembly
 
 shall hold their offices until their successors are elected and qualify.” (Italics ours.) Senators do not so hold. The defendant is a senator but he ceases to be a senator when the 46th assembly ceases to exist and that assembly expires on the first
 
 *21
 
 Monday in January when the terms of the newly elected legislators begin. The argument against the claim that the defendant remains president of the senate after the first Monday in January and until the new 47th legislative assembly meets and the new senate organizes and elects a successor, runs thus: It is only
 
 as president
 
 of the senate that the defendant is invested with a constitutional office entitling him to succeed to the governorship and to perform other duties beyond the parliamentary duties as presiding officer. He ceases to be a senator on the first Monday in January because his term has expired and because he does not hold office
 
 as senator
 
 until a successor is elected and qualified (Const, Art XV, §1). The 46th legislative assembly ceases to exist on the first Monday of January because the terms of the new legislators commence then. There being no legislative assembly and no senators, there is no president of the senate and the legal status as president to which the constitutional powers were attached having ceased to exist, the additional powers also end.
 

 In this case no facts have been shown which raise any present issue as to what would be the legal status of the defendant if Governor McKay should remain as governor until after the first Monday in January and then absent himself or perchance resign before the second Monday of that month. The issue presented now, relates to the present and to a period during the life of the 46th assembly and of the senatorship of the defendant. We deem it unwise to make any declaration as to the law on an hypothetical state of facts which might exist for a week but which we shrewdly suspect will not. It may in the future be held that a special session of an incoming legislature could be called by the governor after the first Monday in Janu
 
 *22
 
 ary and before the second Monday, thus eliminating any hiatus in legislative power even for one week.
 

 We exercise an unaccustomed privilege by expressing our appreciation of the helpful efforts of counsel for defendant and of amicus curiae and of the district attorney who faithfully presented all of the arguments which were reasonably available in the performance of what may have been an unpleasant duty.
 

 It is the judgment of the court that the defendant became governor of the State of Oregon on 6 December 1952 and that he is entitled to take upon himself the execution of such office during the absence of the elected governor.
 

 Defendant will recover costs against the state.