Argued and submitted October 3, petitions are consolidated for purpose of this opinion; Fabiano petition granted, and all other petitions dismissed; reapportionment voided and returned to Secretary of State with directions October 18, corrected reapportionment certified by order December 14, 2001

Tom HARTUNG *et al.*,
*Petitioners,*

*v.*

Bill BRADBURY,
Secretary of State,
*Respondent.*

(SC S48792)

Joe FABIANO
and Charles Stern,
*Petitioners,*

*v.*

Bill BRADBURY,
Secretary of State,
*Respondent.*

(SC S48827)

Cletus MOORE *et al.*,
*Petitioners,*

*v.*

Bill BRADBURY,
Secretary of State,
*Respondent.*

(SC S48829)

Henry KANE
and Clyde V. Brummell,
*Petitioners,*

*v.*

Bill BRADBURY,
Secretary of State,
*Respondent.*

(SC S48833)

Charlotte D. LEHAN *et al.*,
*Petitioners,*

*v.*

Bill BRADBURY,
Secretary of State,
*Respondent.*

(SC S48859)

Bryan Russell PLATT *et al.*,
*Petitioners,*

*v.*

Bill BRADBURY,
Secretary of State,
*Respondent.*

(SC S48862)

Robert T. ANDERSON
and Elise Smurzynski,
*Petitioners,*

*v.*

Bill BRADBURY,
Secretary of State,
*Respondent.*

(SC S48867)

Jim GOAN,
*Petitioner,*

*v.*

Bill BRADBURY,
Secretary of State,
*Respondent.*

(SC S48868)

Danele WELSH *et al.*,
*Petitioners,*

*v.*

Bill BRADBURY,
Secretary of State,
*Respondent.*

(SC S48869)

Edmund G. GRAY
and Robert Hagbom,
*Petitioners,*

*v.*

Bill BRADBURY,
Secretary of State,
*Respondent.*

(SC S48870)

Jeff KROPF *et al.,*
*Petitioners,*

*v.*

Bill BRADBURY,
Secretary of State,
*Respondent.*

(SC S48871)

Donna MCDONNELL,
*Petitioner,*

*v.*

Bill BRADBURY,
Secretary of State,
*Respondent.*

(SC S48874)

Eugene GRANT *et al.,*
*Petitioners,*

*v.*

Bill BRADBURY,
Secretary of State,
*Respondent.*

(SC S48875)
(Consolidated for Argument and Opinion)

33 P3d 972

Paul R. J. Connolly, Salem, argued the cause for petitioners Tom Hartung *et al.* (S48792). With him on the brief was Donna G. Goldian.

Walter R. Gowell, of Haugebert, Rueter, Gowell, Fredricks and Higgins PC, McMinnville, argued the cause for petitioners Joe Fabiano and Charles Stern (S48827). With him on the brief was Rick Sanai, Assistant County Counsel, McMinnville.

Kelly W.G. Clark, of O'Donnell and Clark LLP, Portland, filed the brief for petitioners Cletus Moore *et al.* (S48829).

Henry Kane, Beaverton, and Clyde V. Brummell, Portland, filed the briefs *pro se* for petitioners Kane and Brummell (S48833).

Michael E. Kohlhoff, City Attorney, Wilsonville, argued the cause and filed the brief for petitioners Charlotte D. Lehan *et al.* (S48859).

Bryan Russell Platt, Eagle Point, Valerie Platt, Eagle Point, Nita Williamson, White City, Colleen L. Roberts, Prospect, George Williamson, White City, Sharon Allsop, Shady Cove, and Robert E. Lyon, Butte Falls, filed the petition *pro se* for petitioners Bryan Platt *et al.* (S48862).

Larry L. Kerr, Medford, argued the cause and filed the brief for petitioners Robert T. Anderson and Elise Smurzynski (S48867).

Joseph E. Kellerman, of Hornecker, Cowling, Hassen and Heysell LLP, Medford, argued the cause and filed the brief for petitioner Jim Goan (S48868).

Paul R. J. Connolly, Salem, argued the cause for petitioners Danele Welsh *et al.* (S48869). With him on the briefs was Donna G. Goldian.

Edward H. Trompke, of Jordan Schrader PC, Lake Oswego, argued the cause for petitioners Edmund G. Gray and Robert Hagbom (S48870). With him on the briefs was E. Andrew Jordan.

James C. Egan, of Kryger, Alexander, Egan and Elmer PC, Albany, argued the cause and filed the brief for petitioners Jeff Kropf *et al.* (S48871).

Donna McDonnell, Sunriver, filed the petition *pro se* (S48874).

Eugene L. Grant, of Schwabe, Williamson and Wyatt PC, Portland, argued the cause *in propria persona* for petitioners Eugene Grant *et al.* (S48875). With him on the brief was Karen O'Kasey.

Michael D. Reynolds, Solicitor General, and Erika L. Hadlock, Assistant Attorney General, Salem, argued the cause for respondent. Robert M. Atkinson, Erika L. Hadlock and Daniel J. Casey filed the brief and combined supplemental excerpt of record and appendix. With them on the briefs were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Jeff M. Wilson, Crook County Counsel, filed the brief for *amicus curiae* Crook County (S48827).

James M. Coleman, County Counsel, Oregon City, filed the brief for *amicus curiae* Clackamas County (S48859) (S48875).

Michael Jewett, Jackson County Counsel, Medford, filed the brief for *amicus curiae* Jackson County (S48868).

David J. Hunnicutt, Tigard, filed the briefs for *amicus curiae* Oregonians in Action (S48829) (S48870).

The Port of Brookings Harbor, Port of Gold Beach, and City of Brookings joined petitioners Gray and Hagbom's brief as *amici curiae* (S48870).

Steven R. Lounsbury, Office of Legal Counsel, Coquille, and M. Gerard Herbage, Curry County Counsel, Gold Beach, filed the brief for *amici curiae* Coos County and Curry County (S48870).

RIGGS, J.

## RIGGS, J.

Petitioners have filed original proceedings under Article IV, section 6(3), of the Oregon Constitution, challenging the validity of the plan of reapportionment of legislative districts prepared by the Secretary of State. All the petitions are consolidated for the purpose of this opinion. We grant the petition of Fabiano Petitioners, void the plan of reapportionment, and return the plan to the Secretary of State with directions. We dismiss all the other petitions. Or Const, Art IV, § 6(3).

The petitions before the court are:

S48792, *Hartung et al. v. Bradbury* (Hartung Petitioners);

S48827, *Fabiano and Stern v. Bradbury* (Fabiano Petitioners);

S48829, *Moore et al. v. Bradbury* (Moore Petitioners);

S48833, *Kane and Brummell v. Bradbury* (Kane Petitioners);

S48859, *Lehan et al. v. Bradbury* (Lehan Petitioners);

S48862, *Platt et al. v. Bradbury* (Platt Petitioners);

S48867, *Anderson and Smurzynski v. Bradbury* (Anderson Petitioners);

S48868, *Goan v. Bradbury* (Petitioner Goan);

S48869, *Welsh et al. v. Bradbury* (Welsh Petitioners);

S48870, *Gray and Hagbom v. Bradbury* (Gray Petitioners);

S48871, *Kropf et al. v. Bradbury* (Kropf Petitioners);

S48874, *McDonnell v. Bradbury* (Petitioner McDonnell); and

S48875, *Grant et al. v. Bradbury* (Grant Petitioners).[1]

---

[1] Four of the petitions were submitted on the briefs without oral argument: S48829, *Moore et al. v. Bradbury*; S48833, *Kane and Brummell v. Bradbury*; S48862, *Platt et al. v. Bradbury*; and S48874, *McDonnell v. Bradbury*.

A number of *amici curiae* filed briefs in support of one or more petitioners. The *amici* are: Oregonians in Action, in support of Moore Petitioners and Gray Petitioners; Jackson County, in support of Petitioner Goan; Port of Brookings Harbor, Port of Gold Beach, and City of Brookings, in support of Gray Petitioners; Coos County and Curry County, in support of Gray Petitioners; and Clackamas County, in

# I. MISCELLANEOUS CONSTITUTIONAL CHALLENGES

Several petitions make broad-based constitutional challenges to the Secretary of State's reapportionment plan. We discuss each separately.

## A. *Application of "Separate-Vote" and "Revision" Standards to Article IV, Section 6*

Moore Petitioners and Gray Petitioners challenge the present version of Article IV, section 6, on the ground that the 1986 and 1952 amendments to that provision violated the "separate-vote" requirement of Article XVII, section 1.[2] Accordingly, petitioners contend, Article IV, section 6, retains its original wording, which contained no provision for the Secretary of State to prepare a plan of reapportionment or for this court to review it.

Petitioners assert that their "separate-vote" challenge, as well as their "full-text" and "revision" challenges, discussed *post*, fall within this court's original jurisdiction to review the Secretary of State's plan of reapportionment. Or Const, Art IV, § 6(2)(a), (3)(b). The Secretary of State disputes that those challenges fall within the scope of the court's original jurisdiction and has moved to strike those arguments. We choose to address petitioners' contentions—which we do not find to be well taken—on the merits.[3] We therefore deny the Secretary of State's motion as moot.

---

support of Lehan Petitioners and Grant Petitioners. We have considered the arguments advanced in those briefs to the extent that they supported or augmented those advanced by petitioners.

[2] Article XVII, section 1, provides, in part:

"When two or more amendments shall be submitted in the manner aforesaid to the voters of this state at the same election, they shall be so submitted that each amendment shall be voted on separately."

[3] The Secretary of State also contends that petitioners cannot raise "separate-vote" and "revision" challenges to the 1986 amendments to Article IV, section 6, 15 years after the adoption of those amendments. For purposes of this opinion, we assume, without deciding, that petitioners may do so.

■    In *Baum v. Newbry*, 200 Or 576, 581, 267 P2d 220 (1954), this court concluded that the 1952 version of Article IV, section 6, did not contravene the "separate-vote" requirement of Article XVII, section 1. A 1986 amendment to Article VI, section 6, repealed the 1952 version of that section and replaced it with a new version. However, by contrast to the 1952 amendment to the original version, the 1986 amendment made relatively modest changes. *Compare* Or Const, Art IV, § 6 (1986) *with* Or Const, Art IV, § 6 (1952).[4] In light of this court's conclusion in *Baum* that the more extensive 1952 amendment passed muster under Article XVII, section 1, we conclude that the more limited 1986 amendment necessarily withstands petitioners' constitutional challenge.[5]

Gray Petitioners also contend that the 1986 amendment to Article IV, section 6, revised, rather than amended, the Oregon Constitution, in violation of Article XVII, section 2(1).[6] Petitioners have failed to demonstrate that the 1986

---

[4] For the sake of space, we do not set out the two versions of the section here.

[5] We decline petitioners' invitation to revisit this court's decision in *Baum* in light of *Armatta v. Kitzhaber*, 327 Or 250, 959 P2d 49 (1998). Contrary to petitioners' arguments, nothing in *Armatta* suggests that *Baum* was decided incorrectly; indeed, *Armatta* cites *Baum* favorably for the proposition that Article XVII, section 1, "imposes a requirement aimed at ensuring that the voters are able to express their will in one vote as to only one constitutional change." *Armatta*, 327 Or at 269.

[6] Article XVII, section 2(1), provides, in part:

"In addition to the power to amend this Constitution granted by section 1, Article IV, and section 1 of this Article, a revision of all or part of this Constitution may be proposed in either house of the Legislative Assembly and, if the proposed revision is agreed to by at least two-thirds of all the members of each house, the proposed revision shall * * * be * * * referred by the Secretary of State to the people for their approval or rejection, notwithstanding section 1, Article IV of this Constitution, at the next regular state-wide primary election, except when the Legislative Assembly orders a special election for that purpose. A proposed revision may deal with more than one subject and shall be voted upon as one question."

Gray Petitioners further contend that the 1952 amendment to Article IV, section 6, similarly violated Article XVII, section 2(1). In light of the 1986 amendment to Article IV, section 6, which, as noted, repealed the 1952 version of that section, we do not address petitioners' argument respecting the 1952 amendment.

For the same reason, we do not address petitioners' additional contention that the 1952 amendment violated the "full-text" rule of Article IV, section 1(2)(d), which provides, in part: "An initiative petition shall include the full text of the proposed law or amendment to the Constitution."

amendment to Article IV, section 6—which, as noted, pertained only to reapportionment under that section—amounted to a constitutional "revision." *Compare Holmes v. Appling*, 237 Or 546, 552, 392 P2d 636 (1964) (56-page document entitled "Proposed Constitutional Amendment" was "revision" because it provided for "thorough overhauling of the present constitution"). We therefore reject petitioners' challenge.

B.  *Governor's Authority to Veto Legislature's Reapportionment Plan*

A number of petitioners contend that the legislature passed a plan of reapportionment, that the Governor lacked authority to veto that plan, and that, accordingly, the legislature's plan remains in effect. Therefore, according to that argument, the Secretary of State lacked authority to draft a plan of reapportionment under Article IV, section 6.[7] For the reasons that follow, we reject that argument.

The foregoing argument is based on the wording of the present version of Article IV, section 6, which was adopted by legislative referral in 1986. Under *Ecumenical Ministries v. Oregon State Lottery Comm.*, 318 Or 551, 871 P2d 106 (1994), the court begins its analysis of the meaning of the amendment with the text and context of the provision. *Id.* at 559.

Article IV, section 6, contains several subsections that are relevant to our analysis. Subsection (2) "governs judicial review and correction of a reapportionment *enacted* by the Legislative Assembly." Or Const, Art IV, § 6(2) (emphasis added). Subsection (3) "governs enactment, judicial review and correction of a reapportionment if the Legislative Assembly *fails to enact* any reapportionment by July 1 * * *." Or Const, Art IV, § 6(3) (emphasis added). It is in the latter circumstance that the Secretary of State has a duty to make a reapportionment plan in the first instance. Or Const, Art IV, § 6(3)(a).[8]

---

[7] That issue is presented by Moore Petitioners, Anderson Petitioners, Petitioner Goan, Welsh Petitioners, Gray Petitioners, and Petitioner McDonnell. *Amicus* Jackson County, appearing in support of Petitioner Goan, makes the same argument.

[8] The Oregon Constitution repeatedly refers to the legislature's power to "enact" laws. *See, e.g.*, Or Const, Art II, § 8 ("The Legislative Assembly shall

■ The question is whether the Governor may veto a reapportionment plan passed by the Legislative Assembly. The constitution grants the Governor general power to prevent bills from becoming law by vetoing them, subject to the Legislative Assembly's ability to override the veto. Or Const, Art V, § 15b.[9] There is nothing in the text, context, or history of Article IV, section 6, that suggests that a legislative reapportionment is different from other bills or otherwise somehow is *not* subject to the veto power. Petitioners' arguments rely only on the absence of certain wording (*i.e.*, the text and history of Article IV, section 6, do not state expressly that a legislative reapportionment is subject to gubernatorial veto). In light of the well-understood, traditional constitutional process that includes presentment to the Governor after a matter has been approved by both houses of the Legislative Assembly, that argument claims too much from silence. Neither are we persuaded by petitioners' other arguments.

The Governor vetoed House Bill 2001, the Legislature's plan of reapportionment. The legislature did not override that veto. Therefore, the legislature did not "enact" a

---

enact laws to support the privilege of free suffrage * * *."); Art II, § 31(6) ("The Legislative Assembly shall enact penalties for violation of section 30 of this Article."); Art IV, § 22 (" * * * [I]f, at any session of the Legislative Assembly, there are enacted two or more acts amending the same section, each of the acts shall be given effect to the extent that the amendments do not conflict in purpose. If the amendments conflict in purpose, the act last signed by the Governor shall control."). We know of no case holding that those words, wherever used, are not intended to be read in the context of the Governor's veto power. Indeed, Article IV, section 22, expressly contemplates that the acts "enacted" by the Legislative Assembly will be signed by the Governor, as it uses the date of signature to determine which of two conflicting amendments controls.

[9] Article V, section 15b, provides, in part:

"(1) Every bill which shall have passed the Legislative Assembly shall, before it becomes a law, be presented to the Governor; if the Governor approve, the Governor shall sign it; but if not, the Governor shall return it with written objections to that house in which it shall have originated, which house shall enter the objections at large upon the journal and proceed to reconsider it.

"(2) If, after such reconsideration, two-thirds of the members present shall agree to pass the bill, it shall be sent, together with the objections, to the other house, by which it shall likewise be reconsidered, and, if approved by two-thirds of the members present, it shall become a law. But in all such cases, the votes of both houses shall be determined by yeas and nays, and the names of the members voting for or against the bill shall be entered on the journal of each house respectively."

reapportionment plan by July 1, and the duty to do so passed to the Secretary of State under Article IV, section 6(3)(a).

C. *Application of Article IV, Section 7, to a Reapportionment Plan*

Welsh Petitioners and others contend that the Secretary of State's plan violates Article IV, section 7, which provides, in part: "A senatorial district, when more than one county shall constitute the same, shall be composed of contiguous counties, and no county shall be divided in creating such senatorial districts."[10]

Welsh Petitioners concede that Article IV, section 7, cannot be given full effect because of the "one person, one vote" principle that the United States Supreme Court recognized as embedded in the Fourteenth Amendment to the United States Constitution. *See, e.g., Brown v. Thompson,* 462 US 835, 842, 103 S Ct 2690, 77 L Ed 2d 214 (1983) (discussing requirements). Welsh Petitioners nevertheless contend that the Secretary of State must respect county boundaries to the extent that that duty may be reconciled with Article IV, section 6, and the United States Constitution.

In *Hovet v. Myers,* 260 Or 152, 158-59, 489 P2d 684 (1971), this court discussed the relevant federal cases under the Fourteenth Amendment and concluded that "the existing districts formed along county lines must be changed *without regard to county lines* in order to comply with the Federal Constitution." *Id.* at 163 (emphasis added). As a consequence, Article IV, section 7, today imposes no greater duty on the Secretary of State to follow county lines than the duty found in ORS 188.010(1)(c) ("(1) Each district, as nearly as practicable, shall: * * * (c) Utilize existing * * * political boundaries.").

We therefore reject the various constitutional challenges under Article IV, section 7.

D. *Other Constitutional Challenges*

Welsh Petitioners contend that the reapportionment plan violates the Fourteenth Amendment to the United

---

[10] The Secretary of State contends that the 1986 amendments to Article IV, section 6, implicitly repealed the part of Article IV, section 7, at issue here. Because of the basis of our decision, we need not decide that question.

States Constitution. Presently, each House district should have a population of 57,023, and each Senate district should have a population of 114,047. *See* Or Const, Art IV, § 6(1) ("The ratio of Senators and Representatives, respectively, to population shall be determined by dividing the total population of the state by the number of Senators and by the number of Representatives."). The Secretary of State's guidelines allow the population of both House and Senate districts to vary plus or minus one percent from the ideal district population. Welsh Petitioners contend that existing technology allows the Secretary of State to have districts with zero percent variation from the ideal and that the Secretary of State's plan therefore violates the Fourteenth Amendment. Assuming that technological capacity, it is not constitutionally necessary to use it. This court rejected a similar argument in *McCall v. Legislative Assembly*, 291 Or 663, 673-74, 634 P2d 223 (1981), and we do so here.[11]

Welsh Petitioners also argue that the Oregon Constitution requires zero percent population deviation because Article IV, section 6(1), requires that representatives be "apportioned among legislative districts according to population." In fact, the Secretary of State's plan does apportion representation "according to" population.[12] Petitioners have not cited, and we have not been able to locate, any text, context,

---

[11] In *McCall*, this court stated:

"With respect to petitioner's claim under the 14th amendment, we are of course governed by the decisions of the United States Supreme Court. Petitioner concedes that the degree to which the populations of districts created by chapter 261 [the legislature's plan of reapportionment] deviate from the mathematically ideal ratios remains well within limits approved in the relevant decisions. *Gaffney v. Cummings*, 412 US 735, 93 S Ct 2321, 37 L Ed 2d 298 (1973), *White v. Regester*, 412 US 755, 93 S Ct 2332, 37 L Ed 2d 314 (1973). He argues, however, that an alternative plan presented to the Legislative Assembly would have deviated even less from the idea of equal district populations, and he candidly urges us to depart from *Gaffney v. Cummings*, *supra*, to hold that the choice of the greater deviations must be supported by some more compelling state objective than to avoid election contests among incumbent legislators. Even if we were to disagree with the *Gaffney* opinion about redistricting for political selfprotection, however, we are not free to hold that the federal Constitution forbids what the United States Supreme Court would sustain. We therefore hold that the legislature's division of the City of Bend and Deschutes County between two districts does not render chapter 261 unconstitutional."

*Id.* at 673-74 (footnote omitted).

[12] "According to" means "in conformity with; consistently with." *Webster's Third New Int'l Dictionary*, 12 (unabridged ed 1993).

or history that would suggest that "according to" should be read to mean apportioned in strict numerical equivalency.

Kane Petitioners and Lehan Petitioners present numerous other constitutional arguments. Both sets of petitioners contend that the Secretary of State violated the Fourteenth Amendment in some manner. Lehan Petitioners also contend that the plan violates the First Amendment to the United States Constitution, and Article II, section 1, of the Oregon Constitution.[13] Kane Petitioners contend that the Secretary of State's plan violates Article I, section 20, of the Oregon Constitution.[14] We find no merit to those arguments and need not discuss them further here.

## II. OTHER LEGAL CHALLENGES

Petitioner Goan contends that the Secretary of State should have deferred to the Legislative Assembly's plan of reapportionment, even though the Governor vetoed that plan. He relies on the following statement in *McCall*: "When the Legislative Assembly is able to achieve agreement in this difficult decennial assignment, that achievement is entitled to be respected if possible." 291 Or at 685. Petitioner Goan misunderstands the significance of the statement in *McCall*, which referred only to this court's standard of review. The statement was not an interpretation of the constitution in the sense that it would need to be for Petitioner Goan's challenge to have merit.

Welsh Petitioners contend that this court should void the Secretary of State's reapportionment plan because the Secretary of State did not use what those petitioners describe as the "settled reapportionment process." Article IV, section 6, grants to this court original jurisdiction to consider whether the plan "complies with subsection (1) of this section and all law applicable thereto" or "does not comply with subsection (1) of this section and all law applicable thereto." Or

---

[13] Article II, section 1, provides: "All elections shall be free and equal."

[14] Article I, section 20, provides: "No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens."

Const, Art IV, § 6(3)(c), (d). Even assuming that past reapportionment plans have followed a "settled" process, in this context that process does not have the force of law and, thus, does not provide a basis for voiding the Secretary of State's plan.

### III. LEGAL STANDARDS GOVERNING SECRETARY OF STATE'S REAPPORTIONMENT AND THIS COURT'S STANDARD OF REVIEW

Before turning to petitioners' particular challenges, we set out the legal standards governing a plan of reapportionment and this court's standard of review as it applies to those challenges.

As noted, this court's original jurisdiction is to determine whether a plan of reapportionment "complies with subsection (1) of this section and all law applicable thereto." Or Const, Art IV, § 6(3)(c).

Article IV, section 6(1), provides:

"At the regular session of the Legislative Assembly next following an enumeration of the inhabitants by the United States Government, the number of Senators and Representatives shall be fixed by law and apportioned among legislative districts according to population. A senatorial district shall consist of two representative districts. Any Senator whose term continues through the next regular legislative session after the effective date of the reapportionment shall be specifically assigned to a senatorial district. The ratio of Senators and Representatives, respectively, to population shall be determined by dividing the total population of the state by the number of Senators and by the number of Representatives. A reapportionment by the Legislative Assembly shall become operative no sooner than September 1 of the year of reapportionment."

The legislature has enacted laws respecting Article IV, section 6(1). Specifically, ORS 188.010 provides:

"The Legislative Assembly or the Secretary of State, whichever is applicable, *shall consider* the following criteria when apportioning the state into congressional and legislative districts:

"(1)  Each district, as nearly as practicable, shall:

"(a)   Be contiguous;

"(b)   Be of equal population;

"(c)   Utilize existing geographic or political boundaries;

"(d)   Not divide communities of common interest; and

"(e)   Be connected by transportation links.

"(2)   No district shall be drawn for the purpose of favoring any political party, incumbent legislator or other person.

"(3)   No district shall be drawn for the purpose of diluting the voting strength of any language or ethnic minority group.

"(4)   Two state House of Representative districts shall be wholly included within a single state senatorial district."

(Emphasis added.) By its terms, ORS 188.010 applies the mandate in its first paragraph to all subsections in that statute, not just to subsection (1).

■■■   The Legislative Assembly also has directed the Secretary of State to promulgate rules regarding reapportionment. ORS 188.015.[15] He has done so. Of particular relevance is OAR 165-008-0060, which provides:

"(1)   In developing a reapportionment plan, the Secretary of State will comply with Section 6, Article IV of the Oregon Constitution, ORS 188.010 and any federal law which imposes requirements in addition to those imposed by the Oregon constitution and statutes.

"(2)   Compliance with the criteria of ORS 188.010(1) shall be to the maximum extent practicable. The following interpretations will be made of specific criteria:

"(a)   'Utilize existing geographic or political boundaries.' When possible, districts will be drawn to utilize county lines and to maintain cities within a single district;

"(b)   'Not divide communities of common interest.' Where urban neighborhoods, rural communities or other communities can be identified, an effort will be made to

---

[15] ORS 188.015 provides:

"The Secretary of State shall adopt rules the secretary considers necessary in carrying out the secretary's reapportionment duties * * *."

retain that community within a single district. Consideration will be given to market areas covered by local media;

"(c) 'Be connected by transportation links.' Road connections of at least a county road should be available within the district from one area of the district to another. This does not apply to unpopulated areas of the district."

In reviewing a plan of reapportionment, this court is not privileged to substitute its judgment about the wisdom of the plan. *Ater v. Keisling*, 312 Or 207, 213, 819 P2d 296 (1991). Rather, our task is to determine whether the Secretary of State has complied with Article IV, section 6(1), "and all law applicable thereto." Or Const, Art IV, § 6(3)(c), (d). However, the constitution and ORS 188.010(1) vest the Secretary of State with discretion in preparing a plan of reapportionment so long as the plan is rational and consistent with the fundamental constitutional requirement that apportionment be made according to population. *See Ater*, 312 Or at 213 (noting "broad discretion vested in the legislature in applying the constitutional formula for apportionment" (internal quotation marks and citation omitted)). Consequently, this court will void a reapportionment plan only if we can say from the record that the Secretary of State either did not consider one or more criteria or, having considered them all, made a choice or choices that no reasonable Secretary of State would have made. A party challenging a reapportionment plan has the burden to show that one of those circumstances is present.

That standard of review is dictated—at least in part—by the flexibility that is built into the statutes and rules that govern a reapportionment. ORS 188.010(1) provides that "[e]ach district, *as nearly as practicable*, shall" comply with five sub-criteria. (Emphasis added.) The consideration to be accorded to each criterion in specific districts, then, is in general granted to the reapportioning body, which in this case is the Secretary of State.

## IV. SPECIFIC CHALLENGES

With the appropriate standard of review in mind, we turn now to the specific arguments presented by the parties.

## A. *Challenges Under ORS 188.010(1)*

Numerous petitioners allege that the Secretary of State violated ORS 188.010(1) because he allegedly ignored geographic or political boundaries, communities of common interest, or transportation links.

### 1. *Challenges to House District 55*

Several petitioners challenge House District 55, which contains Crook and Lake Counties, plus parts of Deschutes, Klamath, and Jackson Counties.[16] Deschutes, Crook, Lake, and Klamath Counties lie east of the crest of the Cascade Mountain range. The part of Jackson County at issue (which includes the communities of Shady Cove, Eagle Point, and Butte Falls) lies west of the crest of the Cascades.

Petitioners first contend that the Secretary of State failed to consider adequately the criteria found in ORS 188.010(1)(c), (d), and (e) (geographic or political boundaries, communities of common interest, and transportation links), and the related administrative rules, OAR 165-008-0060(2)(a), (b), and (c). They contend that Jackson County does not have a community of interest with the remainder of House District 55, that House District 55 should not cross either the geographic boundary of the Cascades or the political (county) boundary, and that the transportation links to the rest of House District 55 are inadequate.

**8.** The Secretary of State's summary regarding House District 55 is as follows:

> "House District 55 contains a large portion of Central Oregon, including Prineville and many other small communities that have a rural resource economy and share agricultural and timber interests. The entirety of Crook County was placed into this district to assure that it remained whole. This district was altered in response to public testimony in three distinct ways: first, it connects the communities south of Bend (now in House District 53) in a

---

[16] The petitioners are: Platt Petitioners, Petitioner Goan, Anderson Petitioners, and Welsh Petitioners. Hartung Petitioners challenge this district indirectly, by incorporating Welsh Petitioners' arguments. *Amicus* Jackson County appeared in support of Petitioner Goan.

House district that unites the needs of Deschutes County residents. Second, this district unites all of White City in its borders. Finally, Crook County was united in one House district. To unite these interests, it is necessary to leave the district in order to drive to all portions of the district. The population deviates from the ideal by .5 percent."

One of Platt Petitioners presented comments about House District 55 to the Secretary of State during public hearings. The Secretary of State responded:

"* * * There is a clear community of interest along social and commercial lines between Klamath County and Jackson County especially with the Medford area. District 57, now District 55, follows the boundary of Congressional District 2. Klamath Falls and Medford are closely connected by Highways 140 and 62. Sunriver, LaPine and other Deschutes communities were removed and placed in a single district. KOBI/KOTI Television stations share ownership and provide daily news about both areas. One station serves Medford; the other serves Klamath Falls. The combined market of the two stations creates a community of interest."

Petitioners point to nothing in the record that demonstrates that the Secretary of State did not "consider" the relevant criteria, nor do petitioners show that his choice to include part of Jackson County in House District 55 was one that no reasonable Secretary of State would have made. Petitioners' allegations that that part of Jackson County has, for example, more of a community of common interest with other communities west of the Cascades, or better transportation links with that area, do not demonstrate that the Secretary of State inadequately considered the appropriate criteria, or that his conclusions were those that no reasonable Secretary of State would have made. *See McCall*, 291 Or at 685 ("This court does not inquire if a more nearly ideal apportionment could be designed, even assuming agreement on what is ideal.").

Anderson Petitioners appear to propose a new district that would meet their concerns. However, Anderson Petitioners fail to submit even the most basic information about their proposed district (such as population), nor do they

discuss how their proposed change would affect House District 55 or others.[17] Under those circumstances, their proposal is not an alternative that the court will consider.

Anderson Petitioners also contend that the Secretary of State violated OAR 165-008-0040 because he improperly refused to accept their comments, which they allege were submitted electronically within the time allowed. Anderson Petitioners concede, however, that one petitioner read the comments aloud at a public meeting that the Secretary of State held on August 3, 2001. Even assuming that the Secretary of State erred in refusing to accept their written submission, that error was harmless.

2.   *S48833, Kane and Brummell v. Bradbury*

The substance of Kane Petitioners' arguments appear to be that the Secretary of State should have paid more attention to county lines, particularly Multnomah County lines.

The Secretary of State indicated in his transmittal letter that

> "[c]ounties in the tri-county Portland Metropolitan area play a relatively small role in the lives of residents. For decades, district lines there have routinely cut across county lines to account for more meaningful boundaries such as city lines, geographic boundaries such as the Willamette River, transportation links including highways and railroads, service districts and neighborhood associations."

At bottom, Kane Petitioners are seeking to substitute their judgment for that of the Secretary of State, arguing that he should have placed emphasis on the same criterion that Kane Petitioners do. It is clear that the Secretary of State considered the criterion that Kane Petitioners emphasize; he simply concluded that, on the record before him, other criteria were more important.

Similarly, we find no merit to Kane Petitioners' argument that the Secretary of State violated ORS 188.010(1) in dividing the City of Beaverton into four House

---

[17] The Secretary of State has indicated that the part of Jackson County at issue contains 41.4% of the population of House District 55.

districts. Kane Petitioners point to nothing in the record that demonstrates that the Secretary of State did not "consider" the relevant criteria. Kane Petitioners have not shown that the Secretary of State made choices that no reasonable Secretary of State would have made.

### 3. *S48859, Lehan et al. v. Bradbury*

Lehan Petitioners challenge the placement of the City of Wilsonville in House District 26.[18] Lehan Petitioners note that virtually all of Wilsonville is in Clackamas County, but that House District 26 joins Wilsonville with Washington County. Lehan Petitioners argue that their community of interest is with the area currently in House District 37. They contend, conversely, that the City of Tualatin shares a community of interest with House District 26. Lehan Petitioners argue that the court should direct the Secretary of State to place Wilsonville in House District 37 and to place Tualatin in House District 26. Lehan Petitioners concede that the populations of the two cities do not match, but suggest that the Secretary of State somehow could correct such problems.

The Secretary of State explained his reasons for drawing House District 26 as he did as follows:

> "House District 26 contains the cities of Gaston, Sherwood and Wilsonville. It also contains a large area of unincorporated Washington County and a smaller area of Clackamas County. The shape of this district changed in response to public testimony, adding areas near Wilsonville including the Wilsonville Tract, an important regional resource. The portion of Hillsboro previously included in this district was removed in response to testimony to contain that city entirely in two House districts. There are good transportation links between the population centers. The population deviates from the ideal by .8 percent."

Regarding House District 37, the Secretary explained:

> "This district complies with the principle of not splitting cities by keeping Tualatin and West Linn whole. These two

---

[18] Clackamas County submitted an *amicus* brief in support of Lehan Petitioners.

communities share an excellent transportation link: Interstate 205. Its southern border is the Willamette. The population deviates from the ideal by zero percent."

The interrelationship of districts means that the Secretary of State must consider the ORS 188.010(1) criteria not only within each district, but also among districts. Lehan Petitioners point to nothing in the record that demonstrates that the Secretary of State did not "consider" the relevant criteria, nor have they shown that the Secretary of State's choices as to how to draw the districts were those that no reasonable Secretary of State would have made.

### 4. *S48869, Welsh et al. v. Bradbury*

In their arguments regarding Article IV, section 7, Welsh Petitioners suggest that the Secretary of State's reapportionment plan violates county boundaries in violation of OAR 165-008-0060(2)(a). As we have noted, ORS 188.010(1) directs only that the districts comply with political boundaries, among other criteria, "as nearly as practicable." ORS 188.010(1)(c). Similarly, OAR 165-008-0060(2) directs the Secretary of State to follow ORS 188.010(1) "to the maximum extent practicable." OAR 165-008-0060(2)(a) interprets ORS 188.010(1)(c) and specifies that, "[w]hen possible, districts will be drawn to utilize county lines." Welsh Petitioners' arguments presume that the Secretary of State was required to, or at least should, have emphasized county boundaries at the expense of all the criteria except population. There is nothing in ORS 188.010(1)(c) or OAR 165-008-0060(2) that requires the Secretary of State to place such importance on county boundaries. The Secretary of State did not err as a matter of law.[19]

Welsh Petitioners further contend that the plan violates ORS 188.010(1)(b) because the districts could have a zero percent deviation from the ideal number, but instead have a "plus or minus one percent" deviation from the ideal.[20]

---

[19] Welsh Petitioners contend that the Secretary of State should have given more consideration to county boundaries in the tri-county area. We considered and rejected that argument in the discussion of Kane Petitioners' arguments above.

[20] We have already considered, and rejected, Welsh Petitioners' similar argument that either the Fourteenth Amendment to the United States Constitution or Article IV, section 6(1), of the Oregon Constitution, required the plan to have a zero percent deviation.

Again, ORS 188.010(1)(b) is only one of five criteria that each district should strive to reach "as nearly as practicable." The Secretary of State has discretion as to how to consider those criteria, both standing alone and with respect to each other. The ability to comply perfectly with one criterion does not mean that the Secretary of State must do so at the expense of all others. Petitioners have failed to show that the Secretary of State's choice to use a "plus or minus one percent" deviation was a choice that no reasonable Secretary of State would have made.

### 5. *S48870, Gray and Hagbom v. Bradbury*

Gray Petitioners contend that the Secretary of State erred in joining House Districts 1 and 2 to create Senate District 1.[21] They argue that House Districts 1 and 9 should have been joined in a senatorial district, that House Districts 2 and 7 should have been joined in a second senatorial district, and that House Districts 8 and 10 should have been joined in a third. They present evidence regarding the community of interest that connects the coastal areas assigned to House Districts 1 and 9.[22]

---

[21] Coos County and Curry County have filed an *amicus* brief in support of Gray Petitioners' arguments, while *amici* Port of Brookings Harbor, Port of Gold Beach, and City of Brookings have joined in Gray Petitioners' brief.

[22] The Secretary of State's explanation of Senate District 1 depends in part on his explanation of House District 1. Regarding the latter district, the Secretary of State has stated:

"The decision to extend this district inland into Douglas County was necessary to ensure that cities under a population of 57,023 be kept whole. Although such municipalities can not justify legislative districts entirely on their own, they nevertheless are whole, unique, and compact communities. To divide them into two or more districts unnecessarily reduces their weight and influence in the legislature.

"Extending House District 1 to into [*sic*] Coos County alone would require cutting into to [*sic*] the City of Coos Bay to acquire sufficient population to meet the minimum population requirement for a House district. However, taking all of Coos Bay into House District 1 to keep the city intact, would result in a district population greater than the ideal. The draft plan had extended the district into Josephine County to resolve this problem. But this configuration encountered considerable opposition from residents in both Curry and Josephine counties. In response to public testimony, the final plan substitutes a linkage with Douglas County.

"The record shows that there are strong connections among Coos, Curry and Douglas counties. For example, the United States Economic Development Administration has designated these three counties as a single Economic Development District. There are excellent transportation links among the population centers of the district Highway 101 and Route 42, a much improved

The Secretary of State must consider numerous criteria in deciding which House districts should be linked into a Senate district. Gray Petitioners point to nothing in the record that demonstrates that the Secretary of State did not "consider" the relevant criteria. They have failed to show that the Secretary of State's choice to link House Districts 1 and 2 into a Senate district was a choice that no reasonable Secretary of State would have made.

### 6. *S48871, Kropf et al. v. Bradbury*

Kropf Petitioners challenge the Secretary of State's reapportionment plan as it applies to Linn County. They contend that the plan: (1) violates ORS 188.010(1)(a) because Senate District 12 and House District 23 contain counties that are not contiguous; (2) violates ORS 188.010(1)(c) because it fails to use existing geographic or political boundaries, specifically Linn County boundaries; (3) violates ORS 188.010(1)(d) because it divides communities of common interest; and (4) violates ORS 188.010(1)(e) because the part of Linn County placed in House District 23 is not connected to Yamhill County by transportation links.

■ ORS 188.010(1)(a) requires only that the *district* be contiguous; it does not mention counties, much less require that every county within the district touch every other county. Kropf Petitioners' arguments regarding communities of common interest appear to be based on the unsupported assertion that the only communities of common interest that should be considered are those within Linn County. Transportation links are only one of the criteria that the Secretary of State must consider, and he did so.

Kropf Petitioners point to nothing in the record that demonstrates that the Secretary of State did not "consider" the relevant criteria, nor do they show that the Secretary of State made choices that no reasonable Secretary of State would have made in drawing the Linn County districts.

transportation link over the draft district. The district population deviates from the ideal by -.6 percent."

As to Senate District 1, the Secretary of State explained:

"The Senate district reunites Winston, in House District 1, with other communities near Interstate 5 in House District 2. This builds on the Coos-Curry-Douglas connections noted in the summary for House District 1."

### 7. *S48874, McDonnell v. Bradbury*

Petitioner McDonnell did not submit a brief. We consider the arguments set out in her petition.[23]

Petitioner McDonnell challenges the plan of reapportionment as it applies to Sunriver. She contends that House District 53: (1) violates ORS 188.010(1)(d) because it splits a community of interest between Sunriver and Bend; and (2) violates ORS 188.010(1)(e) because no transportation link within the district connects the northern half with the southern half (all transportation links go through Bend, which is in House District 54).

House District 54 consists of the City of Bend and a very small amount of the surrounding area. House District 53, which entirely surrounds House District 54, consists of most of the remainder of Deschutes County, including Sunriver. Petitioner McDonnell argues, in effect, that some (unidentified) part of Bend has a greater community of interest with Sunriver than it does with the remainder of Bend. That allegation, and Petitioner McDonnell's other assertions, merely seek to substitute her judgment for that of the Secretary of State regarding communities of common interest. Transportation links are one criterion that the Secretary must consider, and he did so; but, as we have noted, he is not required to consider that criterion in a vacuum.

---

[23] Previously this court has held that the September 15 deadline under Article IV, section 6(3)(b), is extended to the next business day when it occurs on a weekend. *See Ater v. Keisling*, 312 Or 207, 210 n 1, 819 P2d 296 (1991) (so stating). This year, September 15 fell on a Saturday, and Petitioner McDonnell filed her petition on Monday, September 17. Upon further reflection, we now question this court's holding in *Ater*. Under Article IV, section 6(3)(b), this court has original jurisdiction of petitions "filed with the Supreme Court on or before September 15 * * *." *Ater* primarily relied on ORS 174.120 in concluding that, the specific date in the constitution notwithstanding, a filing on a later date nonetheless was timely. *Id.* By its own terms, ORS 174.120 applies only to civil or criminal procedure statutes, not the Oregon Constitution. Neither could a statute change the plain wording of the Oregon Constitution, which appears to set September 15 as an absolute deadline, regardless of the day on which it falls. The remaining authorities cited by *Ater* equally are inapplicable. However, in light of our disposition on the merits, we need not consider further the timeliness of McDonnell's petition.

Petitioner McDonnell points to nothing in the record that demonstrates that the Secretary of State did not "consider" the relevant criteria, nor does she show that the Secretary of State made choices that no reasonable Secretary of State would have made in drawing House Districts 53 and 54.

### 8. *S48875, Grant et al. v. Bradbury*

Grant Petitioners challenge the plan as it applies to Clackamas County.[24] Specifically, Grant Petitioners contend that the plan does not comply with ORS 188.010(1)(c) and OAR 165-008-0060(2)(a) because it unnecessarily ignores Clackamas County boundaries, and does not comply with ORS 188.010(1)(d) and OAR 165-008-0060(2)(b) because it breaks up communities of common interest in Clackamas County.

Grant Petitioners appear to argue that the Secretary of State should have treated county boundaries as more important than other criteria. Thus, for example, Grant Petitioners contend that the Secretary of State should not have placed less emphasis on county boundaries in the tri-county Portland metropolitan area. We rejected that argument by Kane Petitioners, and we reject it here. County boundaries are only one of the criteria that the Secretary of State must consider. The remainder of Grant Petitioners' arguments merely seek to substitute their judgment for that of the Secretary of State as to the various criteria.

Grant Petitioners point to nothing in the record that demonstrates that the Secretary of State did not "consider" the relevant criteria, nor have they shown that the Secretary of State made choices that no reasonable Secretary of State would have made in drawing the Clackamas County districts.

### 9. *S48827, Fabiano and Stern v. Bradbury*

Fabiano Petitioners present a problem of a different sort. Fabiano Petitioners contend that the official census data incorrectly attribute the population of one census block

---

[24] Clackamas County submitted an *amicus* brief in support of Grant Petitioners, in addition to its *amicus* brief in support of Lehan Petitioners.

to another census block in another district. According to the Fabiano Petitioners, House District 23 includes a federal prison in the City of Sheridan with approximately 1,992 inmates. The official census data, however, indicate that that block contains a population of zero. Those petitioners also assert that House District 24 includes a census block with an actual population of zero, but an official census population of 1,992 persons. Fabiano Petitioners therefore contend that the actual populations of House Districts 23 and 24 differ substantially from the populations reported by the Secretary of State.[25] Fabiano Petitioners contend that, consistent with ORS 188.010(1)(b), the Secretary of State should redraw the district lines to equalize the population between the two districts. The failure to do so could mean that the population of those two districts would violate the plus or minus one percent guideline used by the Secretary of State in every other district.

The record demonstrates that two witnesses brought the census data error to the attention of the Secretary of State during public hearings regarding the reapportionment plan. The Secretary of State argues that the official population data provided by the United States Census Bureau support the district lines that he drew for House Districts 23 and 24 and that, to date, the federal government has not altered its official census data. The Secretary of State acknowledges that "there is virtual certainty * * * that the official census blocks have misplaced the Sheridan prison," as the Fabiano Petitioners argue. He asserts, however, that it is less certain whether that error means that the official census has assigned all 1,992 inmates to the census block in House District 24.

The Secretary of State argues that he may use only official census data in developing his reapportionment plan and that he lacks authority to correct official census data on his own initiative. To support that claim, the Secretary of State relies on Article IV, section 6(1), of the Oregon Constitution, which provides, in part:

---

[25] If Fabiano Petitioners are correct, then House District 23 has an actual population of 58,490, rather than the 56,498 reported, while House District 24 has an actual population of 55,323, rather than the 57,315 reported.

"At the regular session of the Legislative Assembly next following an enumeration of the inhabitants by the United States Government, the number of Senators and Representatives shall be fixed by law and apportioned among legislative districts according to population."

According to the Secretary of State, the wording of Article IV, section 6(1), means that the "enumeration of the inhabitants by the United States Government," *i.e.*, the official census, is the only measurement of the "population" on which he is entitled to base his reapportionment plan.

■ The Secretary of State is correct in asserting that, under Article IV, section 6(1), his plan must apportion districts according to "population." However, that constitutional provision *does not by its own terms* require the Secretary of State to determine population solely by reference to the official census published by the United States Census Bureau. Rather, that provision makes it clear that the enumeration of the inhabitants by the United States Government simply is the event that signals the commencement of the constitutional reapportionment process.

The Secretary of State cites no other source of law in support of his claim that he cannot rely on reliable population information developed from data other than the census.

We hold that the Secretary of State incorrectly has assumed that, in determining the population of a district in the face of an admitted error in the census data, he nonetheless must rely solely on official census data. The pertinent constitutional and statutory criteria that apply to reapportionment speak only of "population." *See* Or Const, Art IV, § 6(1) (legislative districts must be apportioned "according to population"); Or Const, Art IV, § 6(3)(a) (requiring reapportionment "in accordance with * * * all law applicable thereto"); ORS 188.010(1)(b) (stating "equal population" criterion). The Secretary of State's reapportionment guidelines authorize no more than a plus or minus one percent deviation from the ideal target population. Due to the error in the official census data of the federal prison census block, the population in House District 23 may deviate significantly from those guidelines.

It follows from the foregoing that the Secretary of State's decision not to attempt to obtain additional or different reliable data regarding the population of the prison census block was one that no reasonable Secretary of State would make. On this record, the failure to seek that data, if available, and to use it to assure compliance with the guidelines, means that the Secretary of State's reapportionment plan does not comply with Article IV, section 6(1), and all law applicable to the preparation of a reapportionment plan. The Secretary of State must determine the population of the prison as of April 1, 2000, the census date, 13 USC § 141(a), from other reliable evidence, including federal prison records, if such are available, and make such changes in legislative district boundaries as the Secretary of State may find appropriate to comply with all pertinent legal requirements, including the Secretary of State's redistricting guidelines.[26]

B. *Challenge Under ORS 188.010(2)*

Several petitioners contend that the Secretary of State drew districts for the purpose of benefitting one political party in violation of ORS 188.010(2).

ORS 188.010(2) prohibits the Secretary of State from drawing districts with the purpose of favoring a particular political party. It may be true that, in some circumstances, this court could infer from a record that a Secretary of State had the purpose of favoring one particular political party over another. However, the mere fact that a particular reapportionment may result in a shift in political control of some legislative districts (assuming that every registered voter votes along party lines)—and that is all that petitioners point to on this record—falls short of demonstrating such a purpose. Petitioners have not met their burden of demonstrating that the Secretary of State had an improper purpose.

---

[26] We stress that this holding is limited to the particular circumstances of this case. We do not suggest that the Secretary of State always must question census data or that the Secretary of State must investigate simply on the allegation that the Census Bureau made an error. The critical facts here are that the census block contains a federal prison, the listed population of zero obviously is in error, and there exists a readily accessible and reliable source of information that will permit the error to be corrected without conjecture or resort to evidence from potentially biased or otherwise unreliable sources.

## C.  *Challenge Under ORS 188.010(3)*

Platt Petitioners contend that the Secretary of State improperly diluted the vote of Native Americans by joining part of Jackson County to House District 55. ORS 188.010(3) prohibits drawing a district "for the *purpose* of diluting the voting strength of any language or ethnic minority group." (Emphasis added.) Platt Petitioners have not pointed to any direct or indirect evidence of such a purpose.

## V.  CONCLUSION

The petitions are consolidated for the purpose of this opinion. The Fabiano petition is granted, and all other petitions are dismissed. The reapportionment is voided and is returned to the Secretary of State with directions that the Secretary of State consider the plan of reapportionment further in light of this opinion, and redraw legislative district lines as may be necessary to comply with Article IV, section 6(1), and all law applicable thereto. The Secretary of State shall correct the reapportionment in the particulars discussed herein and shall file the corrected reapportionment with the court on or before December 1, 2001. The appellate judgment shall issue forthwith.